STATE OF NORTH CAROLINA v. GEORGE MALCOLM CARROLL

No. 587A01

(Filed 20 December 2002)

**1. Criminal Law— defendant's decision not to testify—court's inquiry**

A capital first-degree murder defendant waived his right to testify, and the trial court's inquiry was adequate, where the court's inquiry sufficiently determined that defendant was intellectually capable of understanding his right to testify, had communicated with his attorneys, and had agreed with his attorneys that it was not in his best interest to testify.

**2. Homicide— felony murder—underlying assault—death resulting from separate strangulation—no merger**

The trial court did not err by submitting felony murder to the jury based on a felonious assault where defendant contended that the assault merged with the killing, but the victim died from a separate strangulation and not as a result of the assault.

STATE v. CARROLL

[356 N.C. 526 (2002)]

### 3. Criminal Law— prosecutor's argument—defendant's expert testimony—ability to form intent

The trial court did not abuse its discretion in a capital first-degree murder prosecution by not censuring the prosecutor's closing arguments about an expert opinion as to whether defendant was capable of premeditation and deliberation. The evidence in the record supports the arguments and the prosecutor merely fulfilled his duty to present the State's case with vigor.

### 4. Criminal Law— diminished capacity—instructions

There was no plain error in a capital first-degree murder prosecution where defendant contended that the court's instructions on diminished capacity were inaccurate and misleading in that the instructions grouped intoxication, drug use, and lack of mental capacity together and used the term "lack of capacity" rather than "impaired capacity" or "diminished capacity." The pattern jury instruction given by the court made a finding of diminished capacity more likely in a single instruction and the phrase "lack of mental capacity" has been approved in a prior opinion and was used by defendant in his closing argument. Moreover, the State's evidence of premeditation and deliberation was overwhelming.

### 5. Criminal Law— voluntary intoxication—instructions— irrelevant to felony murder

There was no error in a capital first-degree murder prosecution where defendant contended that the trial court intimated an opinion during its instruction on voluntary intoxication by instructing the jury that a specific intent to kill is not required for felony murder or second-degree murder.

### 6. Evidence— hearsay—murder victim's statements to friend—state of mind

A murder victim's statements to a friend a few days before the murder about difficulties in her relationship with defendant were admissible to show the victim's state of mind rather than as a recitation of facts. Also, the limiting instruction was sufficient to prevent the jury from viewing the evidence as proof of defendant's bad character.

### 7. Jury— polling—two theories of first-degree murder

The trial court did not err by failing to poll each juror individually in the guilt phase of a first-degree murder prosecution to

**STATE v. CARROLL**

[356 N.C. 526 (2002)]

determine if the verdict was unanimous as to each distinct theory of first-degree murder where the trial court's instructions made the jury fully aware of the requirement of a unanimous verdict on each theory of first-degree murder; the transcript unquestionably indicates that the jury unanimously found defendant guilty based on both malice, premeditation and deliberation and under the felony murder rule; the verdict sheet clearly represented the unanimous verdict based on both theories of first-degree murder; and, following the clerk's announcement that the jury unanimously found defendant guilty of first-degree murder on the basis of malice, premeditation and deliberation and under the felony murder rule, each juror individually affirmed that this was his or her verdict. It would strain reason to conclude that the jury's verdict was not unanimously based on both theories of first-degree murder.

**8. Sentencing— capital—aggravating circumstances—prior violent felonies—Florida records**

The trial court in a capital sentencing hearing properly admitted Florida records of a prior violent felony, and the evidence was sufficient for submission of the prior violent felony aggravating circumstance, where a court clerk testified that the Florida documents were signed and verified in a manner verifying their authenticity, and an expert testified that defendant's fingerprints matched the fingerprints of the defendant in the Florida case. N.C.G.S. § 15A-200(e)(3).

**9. Sentencing— capital—nonstatutory mitigating circumstances—offer to plead guilty**

The trial court did not err in a capital sentencing proceeding by not allowing defendant to offer evidence of the nonstatutory mitigating circumstance that he had accepted responsibility for the killing by offering to plead guilty to second-degree murder. The evidence was conflicting as to defendant's willingness to plead guilty to second-degree murder; assuming his willingness to plead guilty, this is evidence only of defendant's willingness to lessen his exposure to the death penalty or a life sentence. Finally, the court submitted the circumstances that defendant admitted involvement to law enforcement officers, provided valuable information, and expressed remorse.

STATE v. CARROLL

[356 N.C. 526 (2002)]

### 10. Jury— polling of foreman on death penalty—sufficient

The trial court sufficiently polled the jury foreman to ascertain whether he agreed with a death sentence where the foreman signed the sentencing recommendation form; the clerk read the answers to the issues and asked the foreman if this was the unanimous recommendation of the jury; the clerk then asked the foreman if the recommendation was his own; and, although the clerk's questioning did not include a reference to the death penalty, Issue Four asks if the aggravating circumstances are sufficient to warrant the death penalty.

### 11. Sentencing— capital—death penalty proportionate

A death sentence was not disproportionate where the evidence fully supported the aggravating circumstances, there was no indication that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and this case was not substantially similar to any case in which the death penalty was found disproportionate. Defendant slapped the victim and struck her on the leg and face with a machete, which cut her head and caused her to bleed uncontrollably; the victim screamed and defendant carried her to a bed, where he put a bedsheet in her mouth and put his hands on her throat; and he attempted to burn the body and the home after she died.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Thompson, J., on 29 May 2001 in Superior Court, Cumberland County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 16 October 2002.

*Roy Cooper, Attorney General, by Gail E. Dawson, Special Deputy Attorney General, for the State.*

*Staples Hughes, Appellate Defender, by Constance E. Widenhouse, Assistant Appellate Defender, for defendant-appellant.*

WAINWRIGHT, Justice.

On 26 March 2000, George Malcolm Carroll (defendant) was charged in a superseding indictment with one count of first-degree arson and with the first-degree murder of his live-in girlfriend, Debra Whitted; this indictment was further amended on 8 May 2001 in open

STATE v. CARROLL

[356 N.C. 526 (2002)]

court. Defendant was also indicted on 26 March 2001 as an habitual felon. Defendant was tried capitally before a jury at the 14 May 2001 session of Superior Court, Cumberland County. At the conclusion of the State's evidence, the trial court dismissed the charges of first-degree arson and for habitual felon status. The jury found defendant guilty of first-degree murder based on malice, premeditation and deliberation and under the felony murder rule. Following a capital sentencing proceeding, the jury recommended a sentence of death. The trial court entered judgment in accordance with that recommendation.

Evidence presented at trial showed that Whitted was retired from the military and lived on disability. She and defendant had been living together on and off for about a year and a half in a trailer at 239 Eleanor Avenue in Fayetteville, North Carolina. Whitted's best friend, Amanda McNeil, visited her regularly. On Monday, 15 November 1999, Whitted told McNeil that she wanted defendant out of her trailer. Whitted also complained of back problems to McNeil, and McNeil agreed to take her to the hospital the next morning.

McNeil arrived at Whitted's trailer the next morning, Tuesday, 16 November 1999, but found the door locked. After knocking on the door and getting no response, McNeil left. McNeil returned to the trailer at a later time and saw defendant walking out the door. She asked defendant where Whitted was, and defendant told her that she had gone to the hospital. Defendant never looked directly at McNeil when answering her and appeared to be "high" and acting "like a wild man."

Around 10:00 a.m. on 17 November 1999, defendant purchased seventy-seven cents' worth of gas from the Clinton Road Amoco. He told the attendant that he needed gas to cut the grass.

Whitted's niece, Tanisha Whitted, stopped by Whitted's trailer on Wednesday morning, 17 November 1999, but was unable to get anyone to come to the door. Tanisha returned to the trailer again after 11:00 a.m. and discovered that the trailer was on fire. Tanisha called 911 from a neighbor's house. Several neighbors tried to determine if Whitted was inside the trailer. However, because the front door was blocked by a stereo cabinet and the smoke from the fire was too heavy, they made it only a few steps inside before having to retreat.

The Fayetteville Fire Department responded to the call and discovered that two separate fires were burning, one small fire in the

den and a second, larger fire in the bedroom. Whitted's partially charred body was discovered on the bed. Evidence at the scene indicated that an accelerant had been used to start the fires. A machete was found on the living room floor.

Investigator Ralph Clinkscales of the Fayetteville Police Department arrived at the scene and began trying to locate defendant. At approximately 7:30 p.m. on 17 November, Clinkscales received a page from defendant's mother, indicating that defendant would turn himself in at a church on the corner of Monagan and Cumberland Streets. Clinkscales met with defendant at the church. Defendant told police, "Here I am. Please don't hurt me. I did not mean to hurt her. I know I'm in a lot of trouble for what I did." Defendant then began crying uncontrollably. Officers arrested defendant and took him to the Police Department.

Clinkscales and his partner read defendant his *Miranda* rights. Defendant signed a waiver of his rights and voluntarily began telling the officers what had happened.

According to defendant, on Monday, 15 November 1999, defendant and Whitted were drinking gin and beer when they got into an argument around 11:30 p.m. Defendant slapped Whitted with his hand and she began fighting him. Defendant picked up a machete, slapped Whitted on her leg with the flat side of the machete, and hit her in the face. Whitted moved to avoid another strike and the machete struck her in the back of the head. Defendant stated that "[b]lood poured out in a steady stream." Defendant placed Whitted on the couch, and Whitted asked him not to leave her. Blood started to flow from Whitted's nose and mouth and she started to scream. Defendant put his hand over Whitted's mouth and told her to be quiet.

Defendant carried Whitted into the bedroom and tried to quiet her screams by putting his hand on her neck and by putting a sheet around her neck. After a long time, Whitted became quiet and still. Defendant placed her in the bed and covered her with a blanket. Defendant began to think about how to get Whitted some help without being there, but he fell asleep. When defendant awoke, he realized that Whitted was dead.

Defendant cleaned himself up and left the trailer. He returned that evening and fell asleep on the couch. When he woke up, he decided to burn the trailer with Whitted's body in it. Defendant purchased gasoline and poured it over the victim, throughout the bed-

**STATE v. CARROLL**

[356 N.C. 526 (2002)]

room, and in the living room. After first changing his clothes, defendant lit a piece of newspaper and set fire to the bedroom and then the living room. Defendant exited through the front door.

Associate Chief Medical Examiner Robert Thompson performed an autopsy on Whitted's body on 19 November 1999. Dr. Thompson opined that the cause of death was ligature strangulation, or strangulation using a rope or sheet wrapped around the neck and pulled taut. The victim also had a cut on the back of her head that pierced the scalp and cut into the bone. Dr. Thompson determined that this wound was not fatal. A toxicology report showed less than five percent saturation of carbon monoxide, an indication that Whitted was not alive at the time of the fire. The report also indicated no trace of alcohol, cocaine, or morphine.

## GUILT-INNOCENCE PHASE

[1] In his first assignment of error, defendant contends that the trial court erred by concluding that defendant had waived his right to testify. Defendant asserts he did not knowingly waive his right to testify because the trial court's inquiry of him regarding his right to testify was inadequate.

Following closing arguments at the guilt-innocence phase of the trial, the trial court took a brief recess before instructing the jury. At the end of the recess, the trial court questioned defendant as follows:

THE COURT: Before the jurors come back in, I need to make an inquiry of your client. Madam Clerk, would you swear the defendant.

GEORGE MALCOLM CARROLL, having been first duly sworn, was examined and testified as follows:

THE COURT: Mr. Carroll, I need to ask you a couple questions and you can consult with your attorneys before you answer them if you desire.

THE DEFENDANT: Yes.

THE COURT: First of all, how old are you?

THE DEFENDANT: 40.

THE COURT: How much education have you had?

THE DEFENDANT: 14 years education.

STATE v. CARROLL

[356 N.C. 526 (2002)]

THE COURT: Have you consulted with your attorneys concerning your right to testify in your own behalf?

THE DEFENDANT: Yes.

THE COURT: And have you decided not to testify in your own behalf?

THE DEFENDANT: Yeah, I think we came to that agreement, sir.

THE COURT: Do you feel that it is in your best interest not to testify in your own behalf?

THE DEFENDANT: I don't know, sir.

THE COURT: Based on your conversations with your attorneys, do you feel like it is in your best interest not to testify?

THE DEFENDANT: Well, I—well, at this point, no, sir, it's not to my best interest.

THE COURT: Okay. And you understand your full right to testify in any procedure?

THE DEFENDANT: Yes, I do, sir.

THE COURT: Thank you very much. You may have a seat. The Court finds the defendant knowingly, voluntarily, understandingly waived his right to testify on his own behalf at this stage in the proceedings, feels that it's in his best interest not to testify.

Defendant contends that his responses to the trial court's questions demonstrate he was unsure that it was in his best interest not to testify. Defendant therefore contends that the trial court was required to offer defendant the opportunity to testify or, at a minimum, to question him further. Defendant concedes that we have never required trial courts to inform a defendant of his right not to testify and to make an inquiry on the record indicating that any waiver of this right was knowing and voluntary. Nonetheless, defendant cites numerous cases from other jurisdictions as persuasive authority for us to adopt such a rule.

In the present case, the trial court exercised an abundance of caution in determining that defendant was aware of his right to testify. The court's inquiry sufficiently determined that defendant was intellectually capable of understanding his right to testify, had com-

**STATE v. CARROLL**

[356 N.C. 526 (2002)]

municated with his attorneys, and had agreed with his attorneys that it was not in his best interest to testify. Defendant's later decision not to testify during the sentencing phase further supports the trial court's conclusion that defendant waived his right to testify on his own behalf. We therefore conclude that defendant waived his right to testify. We find no error in the trial court's actions.

This assignment of error is overruled.

**[2]** In his next two assignments of error, defendant argues that the trial court erred by submitting first-degree felony murder to the jury based on felonious assault as the underlying felony. According to defendant, because the assault on the victim was actually part of a continuous assault leading to her death, the assault was an integral part of the homicide and therefore merged with the killing. Defendant thus argues that the trial court erred in overruling defense counsel's objections to the submission of felony murder.

The trial court instructed the jurors as follows:

I further charge that for you to find the defendant guilty of first degree murder under the first degree felony murder rule, the state must prove three things beyond a reasonable doubt. First, that the defendant committed assault with a deadly weapon inflicting serious injury. Assault with a deadly weapon inflicting serious injury is the intentional assaulting of a person by striking the person with a deadly weapon, a machete, which is a deadly weapon, inflicting serious injury upon that person.

Second, that while committing assault with a deadly weapon inflicting serious injury the defendant killed the victim. A killing is committed in the perpetration or attempted perpetration for the purposes of the felony murder rule where there is no break in the chain of events leading from the initial felony to the act causing death so that the homicide is part of [a] series of incidents which form one continuous transaction.

And third, that the defendant's act was a proximate cause of the victim's death. A proximate cause is a real cause, a cause without which the victim's death would not have occurred.

Defendant argues that the use of felonious assault as the underlying felony for his felony murder conviction is prohibited by the felony murder "merger doctrine" and results in an unjust appli-

cation of the felony murder statute, N.C.G.S. § 14-17 (2001). Defendant contends that where a felonious assault culminates in or is an integral part of the homicide, the assault necessarily merges with the homicide and cannot constitute the underlying felony for a felony murder conviction. In support of his position, defendant cites the following footnote from *State v. Jones*:

> Although this Court has expressly disavowed the so-called "merger doctrine" in felony murder cases involving a felonious assault on one victim that results in the death of another victim, *see, e.g.,* *State v. Abraham*, 338 N.C. 315, 451 S.E.2d 131 (1994), cases involving a single assault victim who dies of his injuries have never been similarly constrained. In such cases, the assault on the victim cannot be used as an underlying felony for purposes of the felony murder rule. Otherwise, virtually all felonious assaults on a single victim that result in his or her death would be first-degree murders via felony murder, thereby negating lesser homicide charges such as second-degree murder and manslaughter.

353 N.C. 159, 170 n.3, 538 S.E.2d 917, 926 n.3 (2000).

Defendant argues that he engaged in one continuous assault on the victim that culminated in her death because the defendant's initial act of striking the victim with a machete cannot exist separately and independently from the acts causing Whitted's death. Defendant therefore contends that under *State v. Jones*, the merger doctrine would operate to prohibit a conviction for felony murder.

Defendant has misconstrued the language of *State v. Jones*. *Jones* precluded the use of assault as the underlying felony for a felony murder conviction only when there is a single assault victim who *dies as a result of the injuries incurred during the assault. See id.* The victim in defendant's case, however, did not die as a result of the assault with the machete. The blow to her head was not fatal. Rather, the cause of death was strangulation. As such, the assault was a separate offense from the murder. Accordingly, the trial court did not err in submitting a felony murder instruction to the jury because the felonious assault did not merge into the homicide.

These assignments of error are overruled.

[3] In his next assignment of error, defendant argues that the trial court erred by failing to censure the prosecutor's gross misconduct during closing argument. We find no such error.

In a capital case, counsel is allowed wide latitude in its argu-
ments to the jury and may argue facts in evidence as well as all rea-
sonable inferences therefrom. *State v. Sanderson*, 336 N.C. 1, 15, 442
S.E.2d 33, 42 (1994). "A jury argument is proper as long as it is con-
sistent with the record and not based on conjecture or personal opin-
ion." *State v. Robinson*, 336 N.C. 78, 129, 443 S.E.2d 306, 331-32
(1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995). The
scope and control of arguments lies largely within the discretion of
the trial court, and " 'the appellate courts ordinarily will not review
the exercise of the trial judge's discretion in this regard unless the
impropriety of counsel's remarks is extreme and is clearly calculated
to prejudice the jury in its deliberations.' " *State v. Rogers*, 355 N.C.
420, 462, 562 S.E.2d 859, 885 (2002) (quoting *State v. Johnson*, 298
N.C. 355, 368-69, 259 S.E.2d 752, 761 (1979)). While this Court will
review a prosecutor's argument in a capital case where the defendant
raised no objection at trial, "the impropriety of the argument must be
gross indeed in order for this Court to hold that a trial judge abused
his discretion in not recognizing and correcting *ex mero motu* an
argument which defense counsel apparently did not believe was prej-
udicial when he heard it." *Johnson*, 298 N.C. at 369, 259 S.E.2d at 761.

In the present case, defendant objects to the following state-
ments made by the prosecutor in closing arguments:

Process of the mind, let's talk about his mind briefly. You
don't need to rebut something that doesn't need to be rebutted.
Dr. Harbin said that that man was capable at the time to form the
intent to kill in a simple method, simple plan. You don't have to
plan it from here to here, just there (pointing at diagram of
house). And he said strangulation is a simple plan. That man had
the mental ability to do it and he did it.

His only problem was a limited cognitive dysfunction
because he was a little slow to react. His I.Q. wouldn't let him get
into Harvard Medical School and he was mildly affected in his
thinking. Well, he can pull off big cons and stuff and do all that
and function in society doing what he chose to do. To keep her
quiet through his thoughtful trial and error problem solving
method, to use the words of the doctor, this man deliberately and
thoughtfully in an intentional act, which is obvious by the means
of which he killed her, committed premeditated murder.

Defendant argues that the prosecutor's comments were designed
to prejudice the jury toward a finding that defendant's own expert

said he was capable of premeditated and deliberate murder. According to defendant, his expert in fact testified he was not capable of premeditated and deliberate murder. Defendant also argues that the prosecutor mischaracterized the evidence to persuade the jury that defendant was capable of premeditated and deliberate murder because defendant was capable of making a simple plan.

Defendant's expert, Dr. Harbin, testified that it was "unlikely" that defendant could premeditate and deliberate and that defendant's ability to form a fixed design to kill was "impaired." Dr. Harbin further testified that defendant was capable of forming a simple plan to kill and upon cross examination stated that strangulation "is not all that complex." This testimony leaves open the possibility that defendant's judgment, while impaired, left him capable of premeditation and deliberation. Additionally, Dr. Harbin testified on direct examination that defendant's IQ scores placed him in the "mildly impaired range or the low range of normal." According to Dr. Harbin, this intelligence level would make it difficult for defendant to attend any kind of graduate school. Regarding cognitive dysfunction in defendant, Dr. Harbin testified that "it was limited pretty much to mild impairment of memory, some significant impairments of what we call psychomotor speed." He further testified that defendant exhibited active trial-and-error solutions to most problems and was disinclined to plan ahead or think problems through before acting. On cross-examination, however, Dr. Harbin acknowledged that defendant was able to think about taking a shower after killing Whitted, changing his clothes after the murder, burning the clothes in the fire he set, and covering up his actions by telling Whitted's friend she had already gone to the doctor.

We conclude that the evidence in the record abundantly supports the arguments made by the prosecutor during his closing statements. The prosecutor merely fulfilled his duty "to present the State's case with earnestness and vigor and to use every legitimate means to bring about a just conviction." *State v. Stegmann*, 286 N.C. 638, 654, 213 S.E.2d 262, 274 (1975), *death sentence vacated*, 428 U.S. 902, 49 L. Ed. 2d 1205 (1976). Defendant has failed to show how the prosecutor's comments infected the trial with unfairness and thus rendered the conviction fundamentally unfair. *See State v. Rose*, 339 N.C. 172, 202, 451 S.E.2d 211, 229 (1994), *cert. denied*, 515 U.S. 1135, 132 L. Ed. 2d 818 (1995).

This assignment of error is without merit.

**[4]** In his next assignment of error, defendant argues that the trial court's instructions to the jury regarding diminished capacity were erroneous and prejudicial because they contained an inaccurate and misleading statement of law. Defendant contends that these instructions intimated an opinion of the court that defendant should be found guilty of felony murder and that they denied defendant the full benefit of his defense.

The trial court instructed the jury regarding diminished capacity as follows:

> You may find there is evidence which tends to show that the defendant was intoxicated, drugged or lacked mental capacity at the time of the acts alleged in this case. Generally, voluntary intoxication or a voluntary drug condition is not a legal excuse for crime. However, if you find that the defendant was intoxicated, drugged or lacked mental capacity, you should consider whether this condition affected his ability to formulate the specific intent to kill which is required for conviction of first degree murder on the basis of premeditation and deliberation.
>
> In order for you to find the defendant guilty of first degree murder on the basis of premeditation and deliberation, you must find beyond a reasonable doubt that he killed the deceased with malice and in the execution of an actual specific intent to kill formed after premeditation and deliberation. If as a result of intoxication, a drug condition or lack of mental capacity the defendant did not have the specific intent to kill the deceased formed after premeditation and deliberation, he is guilty of first degree murder—excuse me, he is not guilty of first degree murder on the basis of premeditation and deliberation.
>
> The law does not require any specific intent to kill for the defendant to be guilty of the crime of first degree murder on the basis of felony murder or second degree murder. Thus, the defendant's intoxication or drug condition can have no bearing upon your determination of his guilt or innocence of these crimes.
>
> Therefore, I charge that if upon considering the evidence with respect to the defendant's intoxication, drug condition or lack of mental capacity you have a reasonable doubt as to whether the defendant formulated the specific intent to kill required for conviction of first degree murder on the basis of premeditation and deliberation, you will not return a verdict of

guilty of first degree murder on the basis of premeditation and deliberation.

Defendant contends this instruction was flawed in three respects: (1) the trial court diminished the importance of the evidence regarding defendant's intoxication, drug use, and impaired mental capacity by giving only a single instruction; (2) the usage of the language "lack of capacity" rather than "impaired capacity" or "diminished capacity" improperly suggested that the jury must find defendant entirely without capacity to premeditate or deliberate in order to consider this evidence; and (3) the third paragraph of the instructions intimates an opinion of the trial judge that the jury should find defendant guilty of felony murder.

With regard to defendant's first two objections, we note that defendant did not challenge the instruction on these grounds at trial. The trial court thus did not have the opportunity to consider or rule on these issues. *See* N.C. R. App. P. 10(b)(1). Indeed, defendant agreed with the trial court that such an instruction was proper. Defendant will not be allowed to complain on appeal absent a showing of plain error. *See* N.C. R. App. P. 10(c)(4); *see also State v. White*, 349 N.C. 535, 570, 508 S.E.2d 253, 275 (1998) (finding no error where defense counsel did not object when given the opportunity at the charge conference or after the charge was given and noting that defense counsel approved the instructions during the charge conference), *cert. denied*, 527 U.S. 1026, 144 L. Ed. 2d 779 (1999); *State v. Penley*, 318 N.C. 30, 47, 347 S.E.2d 783, 793 (1986) (holding that the defendant waived the right to complain of jury instructions on appeal where he specifically objected to several portions of the instructions but not the portions complained of upon appeal).

A plain error is one "so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached." *State v. Bagley*, 321 N.C. 201, 213, 362 S.E.2d 244, 251 (1987), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988). Our review of the trial court's instruction reveals no plain error regarding defendant's mental capacity. The trial court delivered the appropriate pattern jury instruction on this issue, which groups intoxication, drug use, and lack of mental capacity together. N.C.P.I—Crim. 305.11 (1989). By including intoxication, drug use, and lack of mental capacity in the instruction, the trial court provided defendant the benefit of all his evidence. We disagree with defendant's contention that a single instruction diminished the significance of the evidence, as the instruction made it more likely

that the jury could have found all of the evidence sufficient to show diminished capacity. The State's overwhelming evidence of premeditation and deliberation, however, could not have been overcome by defendant's evidence of diminished capacity regardless of whether the evidence was considered under a single instruction or under multiple instructions.

Similarly, we cannot say that the trial court committed plain error in its use of the words "lack of capacity" rather than "impaired capacity" or "diminished capacity." The language "lack of capacity" appears in the pattern jury instructions that this Court approved in *State v. Mash*, 323 N.C. 339, 344, 372 S.E.2d 532, 535 (1988). Moreover, defendant referred to "lack of mental capacity" in his closing argument. We fail to see any error in the trial court's choice of the phrase "lack of capacity."

[5] Finally, defendant objects to the third paragraph of the jury instructions:

> The law does not require any specific intent to kill for the defendant to be guilty of the crime of first degree murder on the basis of felony murder or second degree murder. Thus, the defendant's intoxication or drug condition can have no bearing upon your determination of his guilt or innocence of these crimes.

Defendant contends that this paragraph intimates an opinion of the trial judge that the jury should find defendant guilty of felony murder. At the charge conference, defendant objected to the placement of this paragraph within the instruction concerning voluntary intoxication and lack of premeditation, preferring instead that the instruction be given earlier with the instructions for first-degree murder by premeditation and deliberation and felony murder. Defendant failed to raise the particular objection he now brings before us on appeal. " 'The theory upon which a case is tried in the lower court must control in construing the record and determining the validity of the exceptions.' " *State v. Benson*, 323 N.C. 318, 322, 372 S.E.2d 517, 519 (1988) (quoting *State v. Hunter*, 305 N.C. 106, 112, 286 S.E.2d 535, 539 (1982)). Defendant cannot raise this issue for the first time on appeal.

Nonetheless, we again review defendant's contention based on plain error. We note that the trial court expressly referred to the jury's determination of "guilt or innocence" in its instruction and informed

STATE v. CARROLL

[356 N.C. 526 (2002)]

the jury on the effect of intoxication on both felony murder *and* second-degree murder. The trial court did nothing more than inform the jurors that defendant's intoxication was irrelevant to their determination of guilt or innocence of felony murder or second-degree murder. Moreover, the court instructed the jurors as follows:

> The law, as indeed it should, requires the presiding judge to be impartial. You are not to draw any inference from any ruling that I have made or any inflection in my voice or expression on my face or any question I have asked any witness or anything else that I may have said or done during this trial that I have an opinion or have intimated an opinion as to whether any part of the evidence should be believed or disbelieved, as to whether any fact has or has not been proved or as to what your findings ought to be. It is your exclusive province to find the true facts of the case and to render a verdict reflecting the truth as you find it.

We therefore reject defendant's contention that the jury may have misconstrued the trial court's instructions as requiring them to convict defendant of felony murder or to discount the evidence of impaired capacity.

This assignment of error is overruled.

[6] In his next assignment of error, defendant argues the trial court erred by admitting the victim's hearsay statements in violation of the Rules of Evidence and defendant's state and federal constitutional rights to confront the witnesses against him. Defendant further argues that the testimony was inadmissible regardless of its hearsay character because it was irrelevant and unfairly prejudicial evidence of defendant's bad character. *See* N.C.G.S. § 8C-1, Rules 401-04 (2001). We are not required to respond to defendant's constitutional objections because they were not raised at trial. *See Benson*, 323 N.C. at 322, 372 S.E.2d at 519.

Following a *voir dire*, the prosecutor was permitted to ask the victim's best friend, Amanda McNeill, about statements the victim made within a few days before the victim's death. McNeill testified that on 10 November 1999, Whitted told her, "[M]y man's a crack head and I wish he would leave." McNeill further testified, "[Y]ou could just look at her and tell that she was going through something." Whitted told McNeill that she had asked defendant to leave. Later, on 15 November 1999, one day before the murder, Whitted told McNeill

that she was tired of defendant taking her money to buy drugs and that she "wanted him gone."

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c). However, "[o]ut-of-court statements offered for purposes other than to prove the truth of the matter asserted are not considered hearsay." *State v. Golphin*, 352 N.C. 364, 440, 533 S.E.2d 168, 219 (2000), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001). In this instance, McNeill's testimony is admissible under the state-of-mind exception to the general prohibition on hearsay. *See* N.C.G.S. § 8C-1, Rule 803(3) (2001). Under this exception, a statement is admissible if it applies to a "declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)." *Id.* This Court recently reviewed the law regarding this exception to the hearsay rule:

> "The victim's state of mind is relevant if it bears directly on the victim's relationship with the defendant at the time the victim was killed." *State v. Bishop*, 346 N.C. 365, 379, 488 S.E.2d 769, 776 (1997); *accord [State v.] Westbrooks*, 345 N.C. [43,] 59, 478 S.E.2d [483,] 493 [(1996)]. Moreover, we have also stated that "a victim's state of mind is relevant if it relates directly to circumstances giving rise to a potential confrontation with the defendant." *State v. McLemore*, 343 N.C. 240, 246, 470 S.E.2d 2, 5 (1996); *see also State v. McHone*, 334 N.C. 627, 637, 435 S.E.2d 296, 301-02 (1993) (state of mind relevant to show a stormy relationship between the victim and the defendant prior to the murder), *cert. denied*, 511 U.S. 1046, 128 L. Ed. 2d 220 (1994); *State v. Lynch*, 327 N.C. 210, 224, 393 S.E.2d 811, 819 (1990) (the defendant's threats to the victim shortly before the murder admissible to show the victim's then-existing state of mind); *State v. Cummings*, 326 N.C. 298, 313, 389 S.E.2d 66, 74 (1990) (the victim's statements regarding the defendant's threats relevant to the issue of her relationship with the defendant).

*State v. King*, 353 N.C. 457, 477, 546 S.E.2d 575, 591 (2001), *cert. denied*, 534 U.S. 1147, 151 L. Ed. 2d 1002 (2002).

The testimony in issue directly related to " 'circumstances giving rise to a potential confrontation with the defendant.' " *Bishop*, 346 N.C. at 379, 488 S.E.2d at 776 (quoting *McLemore*, 343 N.C. at 246, 470 S.E.2d at 5), *quoted in King*, 353 N.C. at 477-78, 546 S.E.2d at 591.

Defendant and Whitted were living together in her trailer. The statements demonstrated that Whitted was upset and wanted defendant to leave because Whitted was tired of defendant taking her money to buy drugs. Although she had asked him to leave, defendant remained. One day after Whitted's second statement to McNeill and six days after her first statement to McNeill, defendant beat and strangled Whitted in her home. Viewed in this context, the statements clearly indicate difficulties in the relationship prior to the murder. Accordingly, the statements are admissible not as a recitation of facts but to show the victim's state of mind.

Additionally, we find no prejudice in the admission of the statements. The trial court instructed the jury that the evidence was admissible "to prove [only] a certain state of mind of the deceased at the time" and not "to prove the truth of the conduct described in the statement." This limiting instruction was sufficient to prevent the jury from viewing the evidence as proof of defendant's bad character.

Defendant's assignment of error is without merit.

[7] In his next assignment of error, defendant argues the trial court committed plain error and structural error by failing to poll each juror individually to determine if the verdict was unanimous as to each distinct theory of first-degree murder.

Prior to the jury beginning deliberations, the trial court fully instructed the jury on both the premeditation and deliberation theory of first-degree murder and the felony murder rule. The trial court instructed the jury as follows:

> I instruct you that a verdict is not a verdict until all 12 jurors agree unanimously as to what your decision shall be. You may not render a verdict by majority vote.

> The verdict form sets out first degree murder both on the basis of malice, premeditation and deliberation and first degree murder under the felony murder rule and second degree murder on the basis of malice without premeditation and deliberation. In the event you should find the defendant guilty of first degree murder, please have your foreman indicate whether you do so on the basis of malice, premeditation and deliberation or under the felony murder rule.

The trial court sent the verdict sheet to the jury room with the jury. The verdict sheet provided, in pertinent part:

**STATE v. CARROLL**

[356 N.C. 526 (2002)]

We, the jury, return as our unanimous verdict that the defendant, George Malcolm Carroll, is:

___ 1. Guilty of First Degree Murder

**IF YOU FIND THE DEFENDANT GUILTY OF FIRST-DEGREE MURDER, IS IT**

    ___ A. On the basis of malice, premeditation and deliberation?

    ___ B. Under the first degree felony murder rule?

The jury marked the verdict sheet in each appropriate place to unanimously find defendant guilty of first-degree murder on the basis of malice, premeditation and deliberation and under the first-degree felony murder rule.

Additionally, following jury deliberations and after the jury returned to the courtroom, the clerk stated, "The jury has returned as its unanimous verdict that the defendant, George Malcolm Carroll, as to file number 99 CRS 70909 is guilty of first degree murder on the basis of malice, premeditation and deliberation and under the first degree felony murder rule. Is this your unanimous verdict?" The jury foreman answered, "Yes, it is." The trial court then stated, "So say you all." All the jurors responded, "Yes."

The trial court then instructed the clerk to poll the jury. The clerk first asked the foreman:

THE CLERK: Robert Golden, the jury has returned as its unanimous verdict that the defendant, George Malcolm Carroll, is guilty of first degree murder. Is this your verdict?

JUROR NINE [GOLDEN]: Yes, it is.

THE CLERK: Do you still assent thereto?

JUROR NINE: Yes.

The clerk inquired of the remaining jurors in the same manner and each juror affirmed the unanimity of the verdict.

Defendant contends the clerk should have further inquired whether each juror individually found defendant guilty of first-degree murder both on the basis of malice, premeditation and deliberation and under the first-degree felony murder rule. At trial, defendant failed to object to the form of the poll.

Our extensive review of the record reveals that the trial court made the jury thoroughly aware of the requirement of a unanimous verdict on each theory of first-degree murder. The transcript unquestionably indicates that the jury unanimously found defendant guilty based on both malice, premeditation and deliberation and under the first-degree felony murder rule.

The jury's unanimous verdict based on both theories of first-degree murder was clearly represented on the verdict sheet. Moreover, following the clerk's announcement that the jury unanimously found defendant "guilty of first degree murder on the basis of malice, premeditation and deliberation and under the first degree felony murder rule," each juror individually affirmed that this was indeed his verdict. It would strain reason to conclude that the jury's verdict was not unanimously based on both theories of first-degree murder. Accordingly, the trial court properly polled the jury to ensure that the announced verdict was unanimous. *See* N.C.G.S. § 15A-1238 (2001) ("The poll may be conducted by the judge or by the clerk by asking each juror individually whether the verdict announced is his verdict."). Nothing more was required.

This assignment of error is overruled.

## CAPITAL SENTENCING PROCEEDING

[8] In his next three assignments of error, defendant argues the trial court erred by allowing the jury to consider and find the aggravating circumstance that defendant had been previously convicted of another felony involving the use or threat of violence to another person. *See* N.C.G.S. § 15A-2000(e)(3) (2001). According to defendant, this aggravating circumstance was based solely on irrelevant and unreliable hearsay.

During the sentencing proceeding, the State called Diane Hix, a deputy clerk in Cumberland County, who identified several documents as certified copies of Florida Circuit Court records. Following defendant's objection, the trial court excused the jury and heard the following arguments:

> [DEFENSE COUNSEL]: Your Honor, Ms. Hix is a clerk of our superior court and she is familiar with documents generated by courts, but I'm not sure if she is the person who received this document or even that our clerk's office did. And I know that it's got stamping which represents to be from the State of Florida and it's got Janet Reno's name on it and file stamps and everything. But I

STATE v. CARROLL

[356 N.C. 526 (2002)]

would object, Your Honor, based on the fact that there's no showing of where this came from. She is not the person who's received this document. And I'm not sure under what authority this is being requested to be admitted, Your Honor.

THE COURT: Mr. Hicks.

MR. HICKS [THE STATE]: Pretty straightforward under 902 of our rules of evidence which actually do not apply to a sentencing hearing. These are certified true copies. They are self-authenticating. The purpose of the clerk being up here is to show that's a standard procedure in the clerk's office to have true copy seals, and at this point, that's about all the questions I have for her. Frankly, I could have offered this without any testimony.

THE COURT: Let me look at it just a minute. I believe that's a correct statement of the law. Objection is overruled. Bring the jury back.

Hix then testified that the Florida records identified "Robert Fulton" as the defendant and that the documents included a set of fingerprints made pursuant to the judgment.

The State next called Kathleen Farrell, who was accepted by the trial court without objection as an expert in fingerprint identification. Farrell testified that she had compared the fingerprints in the Florida record to a set of defendant's prints. Farrell said defendant's prints were on a fingerprint card on permanent file in the Cumberland County Sheriff's Department. The card included defendant's name, the charges of first-degree murder and first-degree arson, a street address, and the date "11/17/1999." Farrell testified that fingerprint cards are kept in the ordinary course of business. The trial court allowed the fingerprint card to be admitted, with no objection from defendant.

Also without objection, Farrell testified that the fingerprints in the Florida record and the prints on the Cumberland County fingerprint card were made by the same person. Farrell then stated, again without objection, that the Florida judgment showed a robbery conviction for the defendant in that case. Farrell also read the summary paragraph from the Florida judgment, which indicated the defendant had punched the victim in the nose, knocked him to the ground, and continued to kick him repeatedly, and had then removed the victim's wallet before fleeing.

STATE v. CARROLL

[356 N.C. 526 (2002)]

We conclude that the foregoing evidence was properly admitted to support the State's submission of the (e)(3) aggravating circumstance. The North Carolina Rules of Evidence do not apply in capital sentencing proceedings. N.C.G.S. § 8C-1, Rule 1101(b)(3) (2001); *State v. Hedgepeth*, 350 N.C. 776, 784, 517 S.E.2d 605, 610 (1999), *cert. denied*, 529 U.S. 1006, 146 L. Ed. 2d 223 (2000); *State v. Daughtry*, 340 N.C. 488, 517, 459 S.E.2d 747, 762 (1995), *cert. denied*, 516 U.S. 1079, 133 L. Ed. 2d 739 (1996). Instead, the trial court has discretion to admit any evidence relevant to sentencing. N.C.G.S. § 15A-2000(a)(3) (2001); *State v. Thomas*, 350 N.C. 315, 359, 514 S.E.2d 486, 513, *cert. denied*, 528 U.S. 1006, 145 L. Ed. 2d 388 (1999). Accordingly, the State is allowed to admit any evidence that substantially supports the death penalty. *State v. Brown*, 315 N.C. 40, 61, 337 S.E.2d 808, 824 (1985), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *and overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988).

In the present case, a court clerk testified that the Florida documents were signed and certified in a manner verifying their authenticity. The documents were thus shown to be reliable. Moreover, even if the Rules of Evidence were applied here, the documents could have been properly admitted. *See* N.C.G.S. § 8C-1, Rule 902 (2001) (providing the rules concerning self-authenticating documents).

Additionally, defendant did not object to Kathleen Farrell's expert testimony that defendant's fingerprints matched the fingerprints of the defendant in the Florida case. In our review of the record, we conclude the State fully established the reliability of the fingerprint card Farrell used to conduct her fingerprint comparison. Further, had the Rules of Evidence been applied here, the fingerprint card would have been clearly admissible. *See* N.C.G.S. § 8C-1, Rule 803(6) (the business records exception to the hearsay rule). Farrell's testimony was thus properly admitted to show that defendant had been previously convicted of another felony involving the use or threat of violence to another person under an assumed name.

We conclude that the trial court properly admitted the Florida records, in conjunction with Farrell's expert opinion, as reliable evidence relevant to the State's duty to prove its aggravating circumstances. Accordingly, the evidence was sufficient to support the trial court's submission of the (e)(3) aggravating circumstance to the jury.

These assignments of error are overruled.

**[9]** In his next assignment of error, defendant argues the trial court erred by refusing to allow defendant to offer evidence of the non-statutory mitigating circumstance that defendant had accepted responsibility for the killing by offering to plead guilty to second-degree murder.

During the sentencing proceeding, defendant's attorney made a motion that the trial court allow defendant to present evidence that he was "willing to accept responsibility and take a plea . . . of 391 to 479 months and that he made that offer." Defendant's attorney conceded that this "would be considered part of a settlement conference and those kinds of issues are not normally accepted and are precluded from the case in chief." The trial court ruled, "I'm going to deny your motion to present that evidence. I do not think it's relevant, particularly in view of the fact that it is relative to pretrial negotiations concerning a case. I will let you make whatever proffer you want to make relative to that."

Defendant's attorney then acknowledged that the State had never made a plea offer, although plea negotiations had been ongoing throughout the case. Defendant's attorney further informed the court that defendant was willing to plead guilty to second-degree murder. The State countered that while the defense had made several suggestions concerning what the State should offer defendant, no one ever made clear whether "defendant ha[d] himself offered to take any time." After the trial court instructed the jury on sentencing, defendant's attorney reasserted his earlier motion. The trial court again denied the motion.

"In order for defendant to succeed on this assignment [of error], he must establish that (1) the nonstatutory mitigating circumstance is one which the jury could reasonably find had mitigating value, and (2) there is sufficient evidence of the existence of the circumstance to require it to be submitted to the jury." *Benson*, 323 N.C. at 325, 372 S.E.2d at 521. A trial court must submit a mitigating circumstance only if it is supported by substantial evidence. *State v. Laws*, 325 N.C. 81, 109, 381 S.E.2d 609, 626 (1989), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990). Substantial evidence is enough relevant evidence that a reasonable person would accept it as adequate to support a conclusion. *State v. Fullwood*, 329 N.C. 233, 236, 404 S.E.2d 842, 844 (1991).

In the present case, the evidence is at best conflicting as to defendant's willingness to plead guilty to second-degree murder.

STATE v. CARROLL

[356 N.C. 526 (2002)]

From our review of the record, we can conclusively determine only that defendant's attorney tried repeatedly to obtain a plea offer from the State. Because the State never made an offer, we cannot know with certainty whether defendant would have indeed pled guilty to second-degree murder and accepted a plea agreement.

Assuming *arguendo* that defendant was willing to plead guilty to second-degree murder, this is evidence only of defendant's willingness to lessen his exposure to the death penalty or a life sentence upon a first-degree murder conviction. Defendant's willingness to accept a second-degree murder plea would be more likely a result of his assessment of the risk of trial than his willingness to accept responsibility for his actions. Indeed, defendant admitted to police that he was likely to get the death penalty for his crime. Moreover, defendant chose to plead not guilty and proceed to trial rather than enter a guilty plea and accept responsibility for the killing. Having made this choice, defendant cannot now complain that he should have been allowed to reveal during sentencing his hypothetical willingness to enter a guilty plea to a lesser crime.

Finally, the trial court did submit to the jury the nonstatutory mitigating circumstances that "[d]efendant at an early stage in the proceedings admitted his involvement in the capital felony to law enforcement officers," "[d]efendant's cooperation and the information he provided were valuable to law enforcement," "[d]efendant has expressed remorse for the murder," "[d]efendant told the officers through his mother where to find him and peacefully surrendered." The trial court also submitted to the jury the catchall mitigating circumstance. *See* N.C.G.S. § 15A-2000 (f)(9). Accordingly, the jury was given ample means to determine whether defendant had accepted responsibility for his actions.

In sum, the trial court properly refused to submit as a nonstatutory mitigating circumstance defendant's willingness to accept responsibility for his actions through a plea bargain.

This assignment of error is overruled.

[10] In his next assignment of error, defendant argues the trial court failed to adequately poll the jury foreman as to whether he personally voted to impose a death sentence.

The following portion of the sentencing hearing appears relevant:

**STATE v. CARROLL**

[356 N.C. 526 (2002)]

THE COURT: Mr. Foreman, again I would ask if you would stand and for the record state your name, please.

JUROR NINE [FOREMAN]: Robert Golden.

THE COURT: Mr. Golden, has the jury reached a unanimous recommendation?

JUROR NINE: Yes, Your Honor, we have.

THE COURT: Okay. Would you send the envelope to the officer, please.

(Juror nine hands the envelope to the bailiff who hands it to the Court.)

THE COURT: You may have a seat. Thank you.

JUROR NINE: Thank you.

THE COURT: Madam Clerk, would you take the verdict or the recommendation.

THE CLERK: Will the foreman please stand. Mr. Foreman, the jury has returned as its answers to the issues and recommendation as to punishment as to the defendant, George Malcolm Carroll, in file number 99 CRS 70909 the following: As to issue one, yes; as to issue two, yes; as to issue three, yes; as to issue four, yes. The jury has returned as its recommendation that the defendant be sentenced to death. Is this the unanimous recommendation of the jury?

JUROR NINE: Yes, it is.

THE COURT: So say you all?

(Jurors say "yes.")

THE COURT: Would you poll the jury.

THE CLERK: Will the foreman please stand. Mr. Foreman, you have returned as to the answers to the issues and recommendation as to punishment as to the defendant, George Malcolm Carroll, in file number 99 CRS 70909 the following: As to issue one, yes; as to issue two, yes; as to issue three, yes; as to issue four, yes. Is this your recommendation? Do you still assent thereto?

JUROR NINE: Yes, I do.

STATE v. CARROLL

[356 N.C. 526 (2002)]

THE COURT: You may have a seat.

THE CLERK: You may have a seat. Juror number one, Maurice Dinkins. The foreman—juror number one, the foreman, Maurice Dinkins, the foreman has returned as its answers to the issues and recommendation as to punishment as to the defendant, George Malcolm Carroll, in file number 99 CRS 70909 the following: As to issue one, yes; as to issue two, yes; as to issue three, yes; as to issue four, yes. The foreman has returned as its recommendation that the defendant be sentenced to death. Is this your recommendation?

JUROR ONE: Yes.

THE CLERK: Do you still assent thereto?

JUROR ONE: Yes.

The clerk then individually polled each remaining jury member in this same manner.

Individual polling of a jury is done to ensure that each juror agrees to the sentence recommended. N.C.G.S. § 15A-2000(b); *State v. Richmond*, 347 N.C. 412, 447, 495 S.E.2d 677, 697, *cert. denied*, 525 U.S. 843, 142 L. Ed. 2d 88 (1998). No specific polling method is required to establish this purpose. *State v. Spruill*, 320 N.C. 688, 697, 360 S.E.2d 667, 672 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 934 (1988).

In the present case, the jury poll completely established that every juror agreed with the imposition of the death penalty. The foreman signed the sentencing recommendation form, which indicated the jury's "yes" answers to Issues One, Two, Three and Four, as well as the recommendation of a death sentence. After the clerk read the answers to Issues One through Four and the death recommendation, the clerk asked the foreman if this was the unanimous recommendation of the jury. The foreman affirmed that it was. The clerk then asked the foreman if the recommendation was his own and the foreman affirmed that it was. Although the clerk's questioning of the foreman did not include a reference to the death sentence recommendation, Issue Four asks if the aggravating circumstances are sufficient to warrant the death penalty. Accordingly, we conclude the trial court sufficiently polled the jury foreman to ascertain whether he agreed with the death sentence.

This assignment of error is overruled.

## PRESERVATION ISSUES

Defendant raises fourteen additional issues that he concedes have been previously decided contrary to his position by this Court: (1) the murder indictment unconstitutionally failed to allege all the elements of first-degree murder; (2) the trial court erred by submitting the N.C.G.S. § 15A-2000 (e)(9) aggravating circumstance to the jury under instructions that were unconstitutionally vague; (3) the trial court erred in its jury instructions by limiting consideration of the N.C.G.S. § 15A-2000 (f)(2) and (f)(6) mitigating circumstances to findings of certain specified causes and omitting other possible underlying causes, thereby unconstitutionally precluding the jury from considering the full scope of those mitigating circumstances; (4) the trial court erred in its jury instructions by conditioning the jury's consideration of the N.C.G.S. § 15A-2000 (f)(2) mitigating circumstance, thereby precluding the jury from considering the full mitigating scope of that circumstance; (5) the trial court erred by telling the sentencing jury that it must be unanimous to answer "no" at Issues One, Three, and Four on the issues and recommendation sheet; (6) the trial court erred in its instructions defining the burden of proof applicable to mitigating circumstances by using the terms "satisfaction" and "satisfy," thus permitting jurors to establish for themselves the applicable legal standard; (7) the trial court erred by instructing the jury to decide whether all nonstatutory mitigating circumstances have mitigating value; (8) the trial court erred by instructing the jury on a definition of mitigation that was unconstitutionally narrow; (9) the trial court erred by using the term "may" instead of "must" in sentencing Issues Three and Four; (10) the trial court erred in its penalty phase instructions which allowed each juror in deciding Issues Three and Four to consider only the mitigation found by that juror at Issue Two; (11) the trial court erred in allowing death-qualification of the jury by excusing for cause certain jurors who expressed an unwillingness to impose the death penalty; (12) the trial court erred in its jury instructions on Issue Three that allowed the jury to answer that issue "yes" and recommend a death sentence if it found that the aggravating and mitigating circumstances were of equal weight; (13) the trial court erred by submitting to the jury all of defendant's nonstatutory mitigating circumstances as a single list and by failing to instruct separately on each mitigating circumstance; and (14) the trial court erred by denying defendant's motions to preclude consideration of the death penalty and by sentencing defendant to death because the death penalty is cruel and unusual; the North Carolina capital sentencing scheme is imposed in a discriminatory manner, is

vague and overbroad, and involves subjective discretion; and the death sentence in this case was not supported by the evidence, was disproportionate, and was imposed under the influence of passion, prejudice, and other arbitrary factors.

We have considered defendant's contentions on these issues and find no reason to depart from our prior holdings. Therefore, we reject these arguments.

## PROPORTIONALITY REVIEW

[11] Having concluded that defendant's trial and capital sentencing proceeding were free from prejudicial error, we are required to review and determine: (1) whether the evidence supports the jury's finding of the aggravating circumstances upon which the sentence of death was based; (2) whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2).

In the present case, the jury convicted defendant of first-degree murder based on malice, premeditation and deliberation and under the first-degree felony murder rule. Following a capital sentencing proceeding, the jury found two aggravating circumstances: defendant had been previously convicted of another felony involving the use or threat of violence to another person, N.C.G.S. § 15A-2000(e)(3), and the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9).

The jury found all three statutory mitigating circumstances submitted for consideration: (1) the murder was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); (2) the capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired, N.C.G.S. § 15A-2000(f)(6); and (3) the catchall mitigating circumstance that there existed any other circumstance arising from the evidence that any juror deems to have mitigating value, N.C.G.S. § 15A-2000(f)(9). Of the seventeen nonstatutory mitigating circumstances submitted by the trial court, the jury found four to exist: (1) defendant did not have a positive male role model in his home while growing up, (2) defendant's stepfather introduced defendant to criminal activity at an early age, (3) defendant has a history of drug and alcohol abuse and has suffered

cognitive defects as a result of the drug and alcohol abuse, and (4) defendant's cooperation and the information he provided were valuable to law enforcement.

After thoroughly examining the record, transcript, briefs, and oral arguments, we conclude that the evidence fully supports the aggravating circumstances found by the jury. Further, we find no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. We turn then to our final statutory duty of proportionality review.

The purpose of proportionality review is to "eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden,* 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied,* 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Proportionality review also acts "[a]s a check against the capricious or random imposition of the death penalty." *State v. Barfield,* 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied,* 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). In conducting proportionality review, we compare the present case with other cases in which this Court concluded that the death penalty was disproportionate. *State v. McCollum,* 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied,* 512 U.S. 1254, 129 L. Ed. 2d 895 (1994).

We have found the death sentence disproportionate in eight cases. *State v. Kemmerlin,* 356 N.C. 446, 573 S.E.2d 870 (2002); *Benson,* 323 N.C. 318, 372 S.E.2d 517; *State v. Stokes,* 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers,* 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines,* 345 N.C. 647, 483 S.E.2d 396, *cert. denied,* 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by Vandiver,* 321 N.C. 570, 364 S.E.2d 373; *State v. Young,* 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill,* 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983).

We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate. Defendant was convicted on the basis of malice, premeditation, and deliberation and under the first-degree felony murder rule. "The finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis,* 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds,* 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). Further, this Court has repeatedly noted that "a finding of first-degree murder based on theories of premeditation

and deliberation and of felony murder is significant." *State v. Bone*, 354 N.C. 1, 22, 550 S.E.2d 482, 495 (2001), *cert. denied*, —— U.S. ——, 152 L. Ed. 2d 231 (2002).

In the present case, following an argument, defendant slapped the victim and struck the victim on the leg and face with a machete. The machete cut the back of the victim's head and caused her to bleed uncontrollably. When the victim screamed, defendant carried her to her bed, where he put the bedsheet in the victim's mouth and put his hands on her throat to keep her quiet. After the victim died, defendant attempted to burn the victim's body and the home. We note here this Court's oft-cited proviso that "[a] murder in the home 'shocks the conscience, not only because a life was senselessly taken, but because it was taken [at] an especially private place, one [where] a person has a right to feel secure.' " *State v. Adams*, 347 N.C. 48, 77, 490 S.E.2d 220, 236 (1997) (quoting *State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987)) (alterations in original), *cert. denied*, 522 U.S. 1096, 139 L. Ed. 2d 878 (1998). In sum, the facts of the present case clearly distinguish this case from those in which this Court has held a death sentence disproportionate.

We also compare this case with the cases in which this Court has found the death penalty to be proportionate. *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Although we review all cases in the pool of "similar cases" when engaging in our statutorily mandated duty of proportionality review, "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.*; *accord State v. Gregory*, 348 N.C. 203, 213, 499 S.E.2d 753, 760, *cert. denied*, 525 U.S. 952, 142 L. Ed. 2d 315 (1998). After thoroughly analyzing the present case, we conclude this case is more similar to cases in which we have found the sentence of death proportionate than to those in which we have found it disproportionate.

Whether a sentence of death is "disproportionate in a particular case ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994). Therefore, based upon the characteristics of this defendant and the crime he committed, we are convinced the sentence of death recommended by the jury and ordered by the trial court in the instant case is not disproportionate or excessive.

Accordingly, we conclude that defendant received a fair trial and capital sentencing proceeding, free from prejudicial error. The judgment and sentence entered by the trial court must therefore be left undisturbed.

NO ERROR.