An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA14-141

NORTH CAROLINA COURT OF APPEALS

Filed: 5 August 2014

STATE OF NORTH CAROLINA

v.

JERRY LEE MOORE, JR.

Columbus County
No. 11 CRS 51346

Appeal by defendant from judgment entered 2 August 2013 by Judge Douglas B. Sasser in Columbus County Superior Court. Heard in the Court of Appeals 5 June 2014.

> *Attorney General Roy Cooper, by Assistant Attorney General David N. Kirkman, for the State.*

> *Appellate Defender Staples Hughes, by Assistant Appellate Defender Charlesena Elliot Walker, for defendant-appellant.*

HUNTER, JR., Robert N., Judge.

Defendant Jerry Lee Moore, Jr. ("Defendant") appeals from a jury verdict finding him guilty of first-degree murder. Defendant argues the pattern jury instruction used by the trial court was prejudicial and that his conviction must be vacated. After careful review, we hold this issue was previously decided adversely to Defendant in *State v. Carroll*, 356 N.C. 526, 573

S.E.2d 899 (2002).  Accordingly, we hold that the trial court did not err.

## I. Facts & Procedural History

On 8 July 2011 the Columbus County Grand Jury indicted Defendant on a charge of first-degree murder of Samuel Odell Hampton, III ("Hampton").  Defendant, an indigent, was appointed counsel and asserted the defense of diminished capacity.  Defendant stood trial on 29 July 2013 through 2 August 2013 in Columbus County Superior Court.  The record and trial transcript tended to show the following facts.

Special Agent Adrienne Harvey ("Agent Harvey") said she was informed of a shooting at the Hide Away Club around 4 a.m. on 23 April 2011.  Defendant surrendered himself to local police at the jail near the Columbus County Sherriff's Office.  Agent Harvey arrived at the jail around 5:15 a.m. to interview Defendant.  Defendant was read his *Miranda* rights, voluntarily signed a *Miranda* waiver, and then Agent Harvey interviewed Defendant.  According to Agent Harvey, Defendant understood the questions asked in the interview and was clear and coherent.  Defendant told Agent Harvey that when he shot Hampton he started to pull the gun out of his pocket, realized the safety was on,

lowered it, turned off the safety, and then pointed the gun at Hampton.

After the interview, Defendant helped Agent Harvey and other officers locate and recover the .22 caliber pistol used in the shooting. Defendant led officers to a wooded location to find the weapon. Agent Harvey also testified that seven projectiles were recovered during the autopsy of Hampton. Of these seven shell casings, Agent Harvey stated five were fired and ejected from the .22 caliber handgun that Defendant used.

Assistant Chief Medical Examiner Dr. Johnathan David Privette ("Dr. Privette") testified next about Hampton's autopsy, Hampton's gunshot wounds, and the range at which the gunshot wounds were inflicted. Dr. Privette testified that the cause of death for Hampton was multiple gunshot wounds to Hampton's head, each of which alone had the potential to be fatal. After Dr. Privette's testimony, the State rested its case. Defendant made a motion to dismiss at the close of the State's evidence, which was denied by the trial court.

Defendant testified next at trial, stating he had been in two fights with Hampton prior to 23 April 2011. The first fight was about thirty days prior to the 23 April 2011 shooting; at this fight, Hampton hit Defendant on the head from behind,

scaring defendant. Defendant testified the second fight occurred around a week after the first fight. At this fight, Hampton "got close to [Defendant and] he had his fists balled up[.]" Hampton then started backing away. Defendant stated this event "sort of" scared him and that he had stolen a gun to protect himself from Hampton.

Defendant testified on his own behalf and denied that he ever said he wanted to kill Hampton or that he ever intended to kill Hampton before the shooting on 23 April 2011. However, on cross, when asked "[d]id you not mean to kill [Hampton]," Defendant responded "[e]videntially [sic], yes."

Defendant also testified about his scholastic performance. Defendant was placed in a special education program from the time that he was in the fifth grade until he graduated from high school. Defendant later attended Lenoir Community College, where he played basketball. Defendant eventually dropped out of college due to his poor grades. Defendant said he has difficulties with reading and writing.

Defendant's mother Angelia Kinlaw Hatcher ("Angelia"), testified next, stating that Defendant was always "slow" and that she assisted him with classwork. She repeated that Defendant had been in special education classes during most of

grade school and played basketball at Lenoir Community College before dropping out due to his poor grades. Angelia testified that Defendant was shot in 2009 and thereafter "went into a deep depression." Angelia stated that Defendant engaged in strange behavior such as wearing long-sleeved shirts in the summer, being disrespectful, and talking to himself.

Defendant's final witness, neuropsychologist Christine Herfkens, Ph.D. ("Dr. Herfkens"), testified at trial that she had diagnosed Defendant with "borderline intellectual functioning." Dr. Herfkens said Defendant's overall IQ was seventy-two, two points above the level of mental retardation. Defendant's verbal comprehension was sixty-six which put him at the first percentile for his age. Defendant's processing speed put him in the fifth percentile for his age. Both Defendant's verbal comprehension and processing speed were in the range of impairment. Dr. Herfkens also testified that while Defendant's verbal reasoning skills were low, his nonverbal analysis test results were strong. Defendant's ability to reason in the abstract and to reason pragmatically were in the sixth percentile (also considered impaired) and Dr. Herfkens said these attributes could potentially affect his decision-making processes.

Dr. Herfkens testified it was her opinion that Defendant was capable of making the decision to shoot someone, but that Defendant's impairments may "render him incapable" of making a rational decision. Additionally, Dr. Herfkens testified that individuals who are incarcerated tend to perform better on IQ tests while incarcerated due to their structured environment. Thus, Dr. Herfkens opined that Defendant may have been performing at a higher level during his IQ tests than at the time of the shooting. Dr. Herfkens testified that Defendant faked a suicide attempt in order to get privileges and be moved out of his holding cell. After Dr. Herfken's testimony, Defendant rested his case and renewed his motion to dismiss, which was denied.

During the jury instruction conference, Defendant requested that the court deliver the pattern jury instruction concerning diminished capacity. The court instructed the jury in accordance with N.C.P.I.—Crim. 305.11 (2009), the pattern jury instruction for lack of mental capacity for first-degree murder, as follows:

> You may find there is evidence which tends to show that the defendant lacked mental capacity at the time of the acts alleged in this case. If you find the defendant lacked mental capacity, you should consider whether this condition affected the defendant's

ability to formulate a specific intent which is required for conviction of first degree murder on the basis of malice, premeditation and deliberation.

In order for you to find the defendant guilty of first degree murder on that basis, you must find beyond a reasonable doubt that the defendant killed the deceased with malice and in the execution of an actual, specific intent -- in the execution of an actual specific intent to kill formed after premeditation and deliberation.

If as a result of lack of mental capacity the defendant did not have the specific intent to kill the deceased formed after premeditation and deliberation, the defendant is not guilty of first degree murder on the basis of malice, premeditation and deliberation.

Therefore, I charge that if upon considering the evidence with respect to the defendant's lack of mental capacity, you have a reasonable doubt as to whether the defendant formulated the specific intent required for conviction of first degree murder on the basis of malice, premeditation and deliberation, you will not return a verdict of guilty of first degree murder on that basis.

The jury returned a "unanimous verdict that the defendant is guilty of first-degree [murder] both on the basis of malice, premeditation and deliberation and on the basis of lying in wait." Defendant was sentenced to life in prison without the possibility of parole. Following the verdict, Defendant gave oral notice of appeal in open court.

## II. Jurisdiction & Standard of Review

Defendant appeals as of right from a decision of the trial court pursuant to N.C. Gen. Stat. §§ 7A-27(b), 15A-1444(a) (2013).

Defendant argues that the trial court's diminished capacity jury instruction "constituted plain error because the instruction was erroneous; misleading; and confusing and placed a higher burden upon [Defendant] than he was required by law to bear."

The North Carolina Supreme Court "has elected to review unpreserved issues for plain error when they involve either (1) errors in the judge's instructions to the jury, or (2) rulings on the admissibility of evidence." *State v. Gregory*, 342 N.C. 580, 584, 467 S.E.2d 28, 31 (1996). As Defendant failed to object to the jury instructions that the trial court delivered, we review Defendant's challenge to the diminished capacity instruction for plain error.

Plain error arises when the error is "'so basic, so prejudicial, so lacking in its elements that justice cannot have been done[.]'" *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (citation and quotation marks omitted). "Under the plain error rule, defendant must convince this Court not

only that there was error, but that absent the error, the jury probably would have reached a different result." *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993).

### III. Analysis

Defendant argues that the trial court's instruction regarding whether Defendant "lacked mental capacity" and its reference to Defendant's "lack of mental capacity" which was derived from N.C.P.I.—Crim. 305.11 improperly raised the burden of proving diminished capacity for first-degree murder. We disagree.

Defendant's argument presents an argument resolved in *State v. Carroll*, 356 N.C. 526, 540, 573 S.E.2d 899, 909 (2002) (citing *State v. Mash*, 323 N.C. 339, 344, 372 S.E.2d 532, 535 (1988)). The defendant in *Carroll* similarly asserted that the trial court's reference to a "lack of capacity" was prejudicial in that it raised the burden on the defendant to prove he was completely without capacity to form the required intent before the jury could consider the impact of the defendant's capacity on his ability to form the *mens rea* requirement of first-degree murder. *Id*. Our Supreme Court rejected this argument for two separate reasons: (i) the use of this pattern jury instruction had already been upheld in *Mash* and (ii) the defendant had used

the language "lack of mental capacity" in his own closing argument. *Id.; see also State v. Roache*, 358 N.C. 243, 304, 595 S.E.2d 381, 420 (2004) (holding N.C.P.I.—Crim. 305.11 is an accurate statement of the law).

Similarly, Defendant was the party who requested the delivery of the pattern jury instruction for lack of mental capacity. *Carroll*, 356 N.C. at 540, 573 S.E.2d at 909. Defendant asked the trial court "to add diminished capacity instruction, standard instruction from the Pattern Jury Instruction." After the trial court told Defendant that it would deliver N.C.P.I. Crim. 305.11, the trial court asked Defendant if that was the instruction he sought. Defendant's counsel responded affirmatively, stating "Yes, sir, that's what we want." Defendant did not object when the pattern jury instruction was given.

As N.C.P.I.—Crim. 305.11 has been explicitly adopted by our Supreme Court and Defendant was the party requesting this instruction, the trial court did not err in its jury instructions.

## IV. Conclusion

For the reasons stated above, we find

NO PLAIN ERROR.

Judges ERVIN and DAVIS concur.

Report per Rule 30(e).